In the Matter of ONONDAGA COUNTY WATER DISTRICT et al., Appellants, *v.* BOARD OF ASSESSORS OF THE TOWN OF VOLNEY, Respondent.

In the Matter of ONONDAGA COUNTY WATER DISTRICT et al., Appellants, *v.* BOARD OF ASSESSORS OF THE TOWN OF OSWEGO, Respondent.

In the Matter of ONONDAGA COUNTY WATER DISTRICT et al., Appellants, *v.* BOARD OF ASSESSORS OF THE TOWN OF MINETTO, Respondent.

In the Matter of ONONDAGA COUNTY WATER DISTRICT et al., Appellants, *v.* BOARD OF ASSESSORS OF THE TOWN OF SCHROEPPEL, Respondent.

Fourth Department, July 5, 1974.

*Mackenzie, Smith, Lewis, Michell & Hughes (John F. Lawton* of counsel), for appellants.

*Richard C. Mitchell* for Town of Volney, respondent.

*Sullivan & Ledden (Eugene Sullivan* of counsel), for Town of Oswego, respondent.

*Robert G. Hurlbutt* for Town of Minetto, respondent.

*Walter G. Farnholtz (Robert G. Hurlbutt* of counsel), for Town of Schroeppel, respondent.

SIMONS, J. These are appeals from four separate proceedings brought pursuant to article 7 of the Real Property Tax Law to review the 1969 assessments on property located within the boundaries of the respondent towns of Oswego County. The property is primarily transmission pipelines owned by the Onondaga County Water District.

The assessments fixed by the respondents, and confirmed by the trial court, are based upon the actual cost of construction of the property located within each taxing unit. The appeal presents only a question of valuation, the appellants contending that the assessments on the property should have been depreciated because the water system operated at 25% of capacity during the tax year.

The appellant Metropolitan Water Board is the administrative body which manages the appellant Onondaga County Water District, a public authority created under article 5-A of the County Law. The district draws water from Lake Ontario, puri-

fies it and then transmits the water by pipelines located in the respondent towns to reservoirs and eventually distributes the water to customers. Its facilities in Oswego County are taxable because located outside of the water district (*Matter of Onondaga County Water Dist. v. Board of Assessors of Town of Oswego*, 55 Misc 2d 481, affd. 30 A D 2d 643, mot. for lv. to app. den. 22 N Y 2d 645). In 1969 the appellants sold water wholesale to four customers: the City of Syracuse, the Onondaga Water Authority and the Towns of Clay and Hastings. The appellants do not sell water retail and are not expected or allowed to make a profit from sales. The rates are established to cover the operating costs and the system is expected to be self-supporting but the district does compete with other suppliers and the rates necessarily reflect this competitive influence. The capital costs are met by municipal bonds which are retired from general tax revenues.

The system has a design capacity of 25 million gallons of water daily and a peak capacity of 36 million gallons. On the taxable status date in 1969 the system was operating at approximately 25% of capacity and delivered 6.273 million gallons of water. The system was purposely designed to accommodate increased demand in the future and it has steadily increased the quantity of water sold since operations commenced in 1967.

Appellants do not dispute the cost figures. They supplied the data to respondents. But they contend that ultimately any assessment must reflect a fair appraisal of all the facts affecting value and that respondents' use of only cost data in assessing the property results in the highest tax load possible and fails to take into account the 40-year life and present underutilization of the system. The result is a maximum assessment at a time when the district's revenues are at the minimum for the projected life of the system. They contend that in fixing the assessments for 1969 some consideration of the ''in use'' demand on the system for that year should be reflected in the assessed values. Inherent in this contention is the assumption that periodic increases in the assessment would automatically follow with the expected increase in demand upon the water supply system.

Respondents' position is that cost is a proper method of valuation, that the burden rested upon the appellants to demonstrate illegality and they failed to do so. They urge that the concept of variable assessments based upon variable annual use of the system places too great an administrative burden on the taxing authorities and results in instability in municipal reve-

nues. They rely upon the principle that real property assessments depend upon the value of the real property—not upon the value of the enterprise conducted upon the property. Respondents point out that commercial and industrial assessments are not adjusted for earnings and appellants' assessment should not be.

The record supports a reduction in these assessments. The values fixed by respondents' assessors do not represent the market value of the property.[1]

The general rules pertinent to the case are quickly stated. Section 306 of the Real Property Tax Law requires that all taxable realty shall be assessed at full value and section 2 of article XVI of the Constitution of the State of New York mandates that assessment shall in no case exceed full value. Full value has been equated with market value, the price which a willing purchaser will pay to a willing vendor in an open market (*People ex rel. Parklin Operating Corp. v. Miller*, 287 N. Y. 126). This is determined by analyzing the circumstances of the property in terms of three accepted methods of valuation: comparable sales, capitalization of income and replacement cost less depreciation (*Samuelson v. Salamanca Urban Renewal Agency*, 34 A D 2d 369). The maximum value for assessment purposes is replacement cost less depreciation (*People ex rel. Parklin Operating Corp. v. Miller, supra; Matter of Grossman v. Board of Trustees*, 44 A D 2d 259). The reason frequently expressed for this rule is that a purchaser does not willingly pay a price for real property in excess of the amount for which he could replace it with similar property (*People ex rel. Parklin Operating Corp. v. Miller, supra; Grossman v. Board of Trustees, supra*). The parties agree that there is neither evidence of comparable sales nor evidence by which to capitalize income in this case. Accordingly, they both appraised the property by use of the cost less depreciation method.

The case turns on the issue of depreciation, not physical depreciation in the sense of wear and tear or decrepitude, but depreciation in the sense of obsolescence because of superfluity in the plant.

---

1. It is interesting to note that the City of New York's aqueducts are exempt from local taxation by statute (Real Property Tax Law, § 406, subd. 4; Administrative Code of City of New York, § 731–3.0). As noted, these pipelines are not exempt, but viewing the case in light of the generally accepted philosophy that taxes represent a payment for the burden of services supplied to the taxpayer by the government, it is difficult to justify tax assessments based upon values totaling over 13 million dollars for underground pipeline.

Respondents contend that the system is now just as it was designed to be, it is "as good as new". But that confuses physical depreciation with functional depreciation (cf. 1 Bonbright, Valuation of Property, p. 183). Appellants do not claim impaired serviceability in the property. They claim that the system is functionally obsolescent because, for good and legitimate reasons, they overbuilt its capacity beyond current needs. The two concepts are entirely different and need to be distinguished.

Functional depreciation occurs, and exists here, because the improvement does not perform at the expected level even though the useful physical life of the property has not expired. Functional loss need not always occur, whereas physical depreciation always does with the passage of time. Physical depreciation is a statistical computation, whereas functional depreciation is a "judgment estimate based on a comparison, from the standpoint of operating efficiency, of the existing plant with some assumed standard" (2 Orgel, Valuation under Eminent Domain, § 213, pp. 105–106).

Generally, functional depreciation is spoken of in terms of inadequacy of design, construction, demand or the like, but overbuilding or excess capacity may also be a proper consideration in estimating functional loss (2 Orgel, supra, § 213, p. 107; 1 Bonbright, supra, p. 188). The critical element is the reduction in the value of the property resulting from the lack of use of the property as the result of outside factors. Functional obsolescence results from the inability to deliver full service whether that inability is because of retrogressive phenomena or lack of present demands on the utility (cf. Piazza v. Town Assessor, 16 A D 2d 863). The appellants are entitled to charge functional depreciation against the value of this property although they may not subtract an amount for physical depreciation from the cost.[2] The depressing effect from functional depreciation has the same effect as physical depreciation and it must be weighed in the determination of the assessments. Given the fact that in 1969 this utility operated at 25% capacity and assuming that the system was for sale (ignoring its singular characteristics) no knowledgeable buyer could reasonably be expected to pay the 100% replacement cost. On the other hand, because

---

2. The railroad cases, while not completely analogous, established the principle that a utility may demand an assessment at less than replacement cost on the grounds of deficient earning power (cf. People ex rel. New York Ontario & Western Ry. Co. v. Rosenshein, 300 N. Y. 74; People ex rel. Delaware, Lackawanna & Western R. R. Co. v. Clapp, 152 N. Y. 490, 494; People ex rel. Lehigh Val. Ry. Co. v. Harris, 168 Misc. 685, affd. 257 App. Div. 912, affd. 281 N. Y. 786).

the deficiency was temporary and almost to a certainty may be expected to rise, 25% of the replacement cost does not fairly reflect the market value either.[3]  The value lies somewhere between these two amounts and is susceptible to reasonable adjustment.

The percentage of use of the system since 1969 has been measured by the system's gauges and recorded.  With the benefit of hindsight, the annual increase is known for the past and may be predicted for the future.  Possessed of this knowledge, the parties should be able to minimize administrative problems by establishing a progression of assessments as the use of the system increases.  While the assessment must be reviewed and verified annually (Real Property Tax Law, § 514; *People ex rel. Hilton* v. *Fahrenkopf*, 279 N. Y. 49, 52–53), the precise information available by way of past performance should permit the parties to stabilize not only respondents' tax roll but also the tax influence on appellants' water rates.  The assessors and the trial court made no adjustment for functional depreciation and the matter should be remitted to Trial Term to determine the assessments for the various towns for the tax year 1969 by giving proper weight to this factor.

MARSH, P. J., WITMER, MOULE and CARDAMONE, JJ., concur.

Judgments unanimously reversed without costs and matters remitted to Supreme Court, Oswego County, for further proceedings in accordance with the opinion by SIMONS, J.

---

3. It appears in the record that the appellants have already started preliminary work for anticipated necessary expansion of the facilities.